Wilson Athletic Goods Mfg. Co., Inc. v. Commissioner.
Wilson Athletic Goods Mfg. Co. v. Commissioner
Docket No. 43880.
United States Tax Court
T.C. Memo 1954-163; 1954 Tax Ct. Memo LEXIS 84; 13 T.C.M. (CCH) 913; T.C.M. (RIA) 54268; September 29, 1954, Filed *84 Howard C. Parson, Esq., and Louis R. Simpson, Esq., 4100 South Ashland Avenue, Chicago, Ill., for the petitioner. David H. Nelson, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the petitioner's income tax as follows: Year
Deficiency
1947
$1,529.88
1948
5,398.20
1949
5,957.20
The only issue presented for our determination is whether the respondent erred in determining that petitioner was not entitled to deduct amounts representing amortization of the cost of covenants not to compete. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized under the laws of Delaware and has its principal office in Chicago, Illinois. It filed its Federal income tax returns for the years here involved with the collector of internal revenue for the first district of Illinois. Petitioner has been engaged in the manufacture of athletic goods for many years. It has 15 factories located in 10 different cities where it produces all types of sports equipment, some of which are golf clubs, golf balls, baseball *85 mitts, footballs, basketballs, softballs and athletic clothing of all types. The products which petitioner manufactures are marketed through its whollyowned subsidiary, Wilson Sporting Goods Co., which has 28 branches throughout the United States. Wilson Sporting Goods Co. had always sold athletic shoes under the "Wilson" label. These shoes were not manufactured by petitioner but were purchased from various athletic shoe manufacturers. One of such manufacturers was the Wisconsin Shoe Company of Milwaukee, Wisconsin, hereinafter referred to as Wisconsin Shoe. Wisconsin Shoe had been engaged in the manufacture of athletic shoes since 1907. Chester J. Krauthoefer and Emory W. Krauthoefer, the sons of the founder, became partners in the business with their father in 1910. They were both active in the efficient enterprise. After their father's death in 1922, Chester and Emory Krauthoefer, as surviving partners, became the sole owners of the company. At various times prior to 1947, petitioner had considered expanding its manufacturing operations to include athletic shoes so it could offer a complete line of athletic goods which was manufactured under its direct supervision and control. *86 During the early 1930's petitioner's late president, L. B. Icely, had approached the Krauthoefers in an effort to acquire their shoe factory. The Krauthoefers stated they were not interested in selling their company. The matter was never again discussed until June 1947. At that time Chester Krauthoefer called Fred J. Bowman, who was then vice president of petitioner and in charge of manufacturing, and inquired if petitioner was still interested in acquiring a factory to manufacture athletic shoes. Bowman stated he would discuss the matter with his principals and call him back. Bowman's principals instructed him to enter into negotiations with Chester Krauthoefer for the purchase of the shoe factory. The parties made arrangements for a meeting to be held in Milwaukee in the latter part of June 1947. At the outset of this meeting Chester Krauthoefer informed Bowman that he and his brother Emory were considering retiring from the shoe manufacturing business and, because of the long and satisfactory business relationship existing between them and the petitioner, they would consider selling the assets and business to petitioner. Chester Krauthoefer was then 59 years of age and Emory Krauthoefer *87 was 62. At the first meeting Bowman had a general discussion with Chester Krauthoefer and Lawrence S. Toussaint, the general manager of Wisconsin Shoe, regarding the partners' investment in the shoe company and how they would want to be paid for their interests. Negotiations continued during July, August and September. In view of its inexperience in athletic shoe manufacturing, petitioner thought it was absolutely necessary that it retain the trained personnel of the factory. It wanted to be sure that the beneficial enjoyment of the plant as a going business concern would continue after it was purchased. Therefore, even though the Krauthoefers had stated they planned to retire and Bowman believed them he felt as a conscientious business man he should obtain covenants not to compete from them so as to be certain they would not open a competing business. During the negotiations petitioner's engineers went to Milwaukee and made a survey of the plant and an appraisal of the fixed assets. The appraisers found the equipment to be in good operating condition, and that the total value of the fixed assets was $157,307.70, composed of the following: Machinery and fixed equipment
$ 53,611.00
Movable equipment
21,036.40
Leasehold improvements
32,800.00
Molds, lasts, patterns and dies
49,860.30
Total
$157,307.70
*88 In September 1947 the parties agreed on a selling price of $300,000, plus the excess of the value of current assets over current liabilities. No part of the agreed selling price was allocated to the covenants not to compete given by the Krauthoefers or to any other item. The Krauthoefers' attorneys submitted to Bowman the first draft of the purchase agreement. It did not contain a covenant not to compete. Bowman mentioned this omission to Chester Krauthoefer and stated it should be included in the redrafting of the agreement. Chester Krauthoefer agreed to have it included in the agreement. As a result of the negotiations, petitioner executed an agreement of sale with each of the Krauthoefer brothers on October 8, 1947. The material portions of the contract with Chester Krauthoefer are set forth below (the contract with Emory Krauthoefer was identical except that the latter sold a 45 per cent interest rather than a 55 per cent interest): "THE PARTIES AGREE: "I. Krauthoefer hereby sells his interest in the partnership to Wilson, and Wilson hereby purchases from Krauthoefer his interest in the said partnership, for fiftyfive (55%) per cent of the purchase price as hereinafter fixed. *89 "II. The purchase price to be paid shall be computed as follows: "A basic price of $300,000.00 to be increased or decreased by: "(1) The excess, if any, of the current assets over partnership's liabilities on the closing date, or "(2) The excess, if any, of partnership's liabilities over partnership's current assets on the closing date. "'Partnership current assets', as herein used, shall include only partnership (1) cash on hand, in banks or in transit; (2) inventories of raw materials, work in process and finished goods; (3) inventories of supplies; (4) accounts receivable; and (5) notes receivable (secured and unsecured), shares of capital stock and federal and other bonds and securities, together with the accrued interest thereon. "'Partnership liabilities' shall include partnership (1) accounts payable (excluding accounts payable, if any, to a partner); (2) unpaid employee wages and sales commissions; (3) accrued personal property taxes, withholding taxes, social security payroll taxes and unemployment compensation contributions to closing date, and (4) utility charges to closing date and all liabilities shown on the partnership books, which purchaser hereinafter *90 assumes and agrees to pay. * * *
"III. The purchaser assumes and agrees to pay all Krauthoefer's partnership liabilities, as herein described, in the amount as shall appear upon partnership books of account at the close of business on October 18, 1947; and Krauthoefer is relieved from the performance by him of his agreements contained in the partnership agreement dated March 31, 1932, and Wilson assumes responsibility for the performance of all such agreements. "IV. Krauthoefer represents and warrants that he and Emory W. Krauthoefer have amended the partnership agreement, dated March 31, 1932, by eliminating therefrom Paragraph 16 of such agreement, and that they have cancelled and terminated the 'Partnership Liquidation Agreement' referred to in said Paragraph 16. "V. Krauthoefer agrees, at the request of Wilson, to execute such instruments in such form as Wilson may require, in furtherance of, but not inconsistent with, the terms of this agreement, as may constitute further evidence of Krauthoefer's transfer of his interest in the partnership, his entire interest in specific partnership property, and his right to participate in the management. "VI. It is further understood *91 and agreed that the risk of loss or damage to partnership assets until October 20, 1947 is assumed by Krauthoefer to the extent of his interests therein; and his interest in the full amount of the loss or damage, if any, shall be credited to the purchaser on the purchase price, notwithstanding the amount of insurance carried. "VII. Except as an employee of Wilson, Krauthoefer agrees that for a period of ten (10) years from the effective date of this agreement he will not engage in or be employed by any business in competition with Wilson with respect to the manufacture, distribution, or sale of athletic shoes any where within five hundred (500) miles from the City of Milwaukee." Pursuant to paragraph V of the aforegoing agreement, the Krauthoefers executed, on October 20, 1947, a bill of sale in favor of petitioner, the material parts of which are as follows: "* * * the Sellers [Krauthoefers] do hereby bargain, sell, grant, assign, convey, transfer, and deliver to the Purchaser [Wilson] * * * all the assets of every nature and kind of * * * Wisconsin Shoe Company * * * including the following, to-wit: "All office furniture and fixtures, and all machinery, equipment, tools *92 and dies, fixed and movable, used by the Sellers in the manufacture and/or sale of athletic shoes as aforesaid. "All inventories of raw materials, work in process and finished goods, and all inventories of supplies. "All accounts receivable and notes receivable (secured and unsecured), shares of capital stock and federal and other bonds and securities; and all contracts in any way pertaining to the business of the Sellers in the manufacture and/or sale of athletic shoes. "All patents, trade marks, brands and trade names owned or used by Sellers in the manufacture and/or sale of athletic shoes. "The goodwill of the partnership, and the right to use the name 'Wisconsin Shoe Company.'" After the acquisition of Wisconsin Shoe, petitioner published the following announcement in various trade journals: "As a further step toward supplying the equipment needs of America's athletes from 'one complete line,' Wilson Sporting Goods Co has acquired the highly regarded Wisconsin Shoe Co." * * *
In an announcement to its branch manufacturers, factory superintendents, salesmen and key Chicago personnel, petitioner stated in part: "The Wisconsin line of shoes always has stood for *93 outstanding quality of both material and workmanship. We have had an opportune time to realize this, for we have been dealing with that organization for the last 35 years." The Krauthoefers also assigned to petitioner their interests in various machinery leases, building leases and trademarks. The total consideration for the business acquired was about $570,000. Of this, $300,000 represented the basic purchase price set forth in the agreements of sale, and the balance of about $270,000 represented the excess of current assets over current liabilities as of October 20, 1947, pursuant to paragraph II of the agreement. Prior to the closing date of the sale, Chester Krauthoefer, who had been in charge of manufacturing at Wisconsin Shoe, and Toussaint orally agreed to stay at the factory. Toussaint continued as general manager of the factory. Chester Krauthoefer was employed on a part-time basis to develop and improve shoe models. Petitioner retained the manufacturing personnel at Wisconsin Shoe. When the sale was completed, petitioner's accounting department entered the physical assets acquired from Wisconsin Shoe on its books at the appraised figure of $157,307.70. The accounting *94 department then allocated the balance of the purchase price, $142,692.30, as follows: Covenants not to compete
$132,692.30
Good will
10,000.00
Since the purchase of the partnership interests, the Wisconsin Shoe establishment has been operated as a division of petitioner, and its production of athletic shoes has been sold through Wilson Sporting Goods Co. outlets. The factory does not make direct sales to customers. The entire production of the establishment has been marketed under "Wilson" trade brands and trade names, and none of the trade brands or trade names of Wisconsin Shoe have been utilized. Petitioner did not solicit customers of Wisconsin Shoe, as the entire athletic shoe production of that factory was not sufficient, either at the time of its purchase or at the present time, to take care of the demands of petitioner's own trade. In 1947 petitioner commenced to amortize over a 10-year period the amount which it attributed to the covenants, $132,692.30. In its Federal income tax returns for that year and 1948 and 1949, it took deductions for amortization computed on the foregoing basis. The respondent disallowed the deductions. The covenants not to *95 compete were an integral part of the intangible assets of Wisconsin Shoe and, therefore, were nonseverable items of the contracts. Opinion The sole issue is whether or not the petitioner actually bargained and paid for the covenants not to compete as separate items when it purchased Wisconsin Shoe. If so, the covenants may be amortized ratably over the life of the agreement. , affd. . If not, no value may be allocated to them. . Applicable provisions of the Internal Revenue Code of 1939 and regulations promulgated thereunder are set forth in the margin. [1]
*96 The petitioner contends that the manufacture of athletic shoes was an entirely new industry to it and that in order to permit it to retain the experienced employees of Wisconsin Shoe, it was necessary to obtain the convants not to compete from the Krauthoefers so that it could be assured that the partners would not open a new shoe factory in competition with it and rehire their former employees. Further, it contends that since Wisconsin Shoe had never used its name as a trade name, it had no good will, that its trade-marks had no real value, and, therefore, the difference between the appraised value of the fixed assets and the selling price of $300,000 must be the value of the covenants not to compete. The contracts also provided for the payment of an additional sum over and above this basic price for current assets, including inventories. The value of such current assets is not here in issue. Petitioner's argument is based on the premise that Wisconsin Shoe had no good will value because the trade-marks, trade names and name "Wisconsin Shoe Company," from an operating standpoint, were not used by petitioner and Wisconsin Shoe's customers were not solicited. Good will is not restricted *97 to trade names or customers' lists. This Court has regarded good will as including "a coordinated and working office and organization, tradition, habit, etc. When a going business entity is purchased as a unit, it frequently has an intangible value * * *." . Also, in , the Court said "While it is true that any value attributable to customers' lists and formulae was negligible, we feel that the business did have a good will connected with it." In , citing , we said "good will is not necessarily confined to a name. It may as well attach to a particular location where the business is transacted, or to a list of customers, or to other elements of value in the business as a going concern." Petitioner's president, Bowman, recognized this value, for it was his desire that Wisconsin Shoe be purchased only as a going concern. Petitioner's former president, L. B. Icely, also recognized the intangible value of Wisconsin Shoe when, in his public announcement of the purchase, he stated: "* * * Wilson Sporting Goods *98 Co. has acquired the highly regarded Wisconsin Shoe Co. "This unique concern is devoted to the production of highly specialized athletic shoes exclusively. "The Wisconsin Shoe Co. will operate as a division of Wilson Sporting Goods Co., and its fine products will thus be made available to more players and teams through Wilson distributors than was possible before. We are happy to announce this most recent evidence of WILSON LEADERSHIP in service to our distributors." In a bulletin to its branch managers, factory superintendents and salesmen, Icely stated: "The Wisconsin line of shoes always has stood for outstanding quality of both material and workmanship. We have had an opportune time to realize this, for we have been delaing with that organization for the last 35 years." The record is meager as to the details respecting the bargaining between petitioner and the Krauthoefers concerning the covenants not to compete. Bowman testified that petitioner was determined to obtain the covenants; that while the first drafts of the purchase agreements recited the agreed purchase price of $300,000, they contained nothing as to the covenants; and that when he called the omission to *99 the attention of Chester Krauthoefer, the latter agreed to the inclusion of the covenants. Other evidence indicates that the Krauthoefers considered the consideration to be received by them from the transaction was to be payment for the partnership assets and business and, consequently, had no objection to entering into the covenants not to compete. At this time Chester Krauthoefer was 59 years of age and Emory was 62 and both were considering retiring from all business. In negotiating the sale, neither of them contemplated, or gave thought to, starting a new shoe factory or entering any other kind of business. At any rate, the final purchase agreements, although reciting a purchase price of $300,000 and containing covenants not to compete, contained no allocation of any portion of the $300,000 to the covenants. From a consideration of the evidence bearing on the point, we are unable to find that the parties dealt with the covenants not to compete as separate items in the transaction. The evidence shows that petitioner acquired a going business with a value in excess of that of the tangible assets. This going business value was what petitioner was endeavoring to protect when it obtained *100 from the Krauthoefers the covenants not to compete. The two items are not severable. See ; We are given no proof here as to the value placed by the parties to the contract on the convenants not to compete, but even had they placed a contract value thereon that fact alone would not require a contrary holding. , affd. (C.A. 6, 1950) , certiorari denied . We conclude that the covenants not to compete were not items which were severable from the entire transaction. Accordingly, no deduction with respect to the amortization or exhaustion thereof is allowable. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. REGS. 111 Sec. 29.23(1)-3. Depreciation of Intangible Property. - Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will.↩